STATE of Alabama on the relation of Irvine C. PORTER, etc., Plaintiff,

v.

DUN AND BRADSTREET, INC., a corporation, Defendant.

Civ. A. No. 70-957.

United States District Court,
N. D. Alabama, S. D.

March 22, 1972.

Marvin Cherner and Frank Young, III, of Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

L. Vastine Stabler, Jr., of Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LYNNE, Chief Judge.

Seeking by quo warranto to determine whether the activities of Dun & Bradstreet in its Commercial Collection Division constitute the practice of law and praying for a prohibition in the event the Court finds that such conduct constitutes the practice of law, plaintiff brings this suit. After careful consideration of the stipulation agreed to by the parties, the testimony, exhibits and briefs, the Court is of the opinion that none of the activities of Dun & Bradstreet, Inc. constitute the practice of law and that judgment is due to be rendered in favor of the defendant.

### FINDINGS OF FACT

Dun & Bradstreet commenced business in the United States in 1841 and opened its first office in Birmingham in 1895. Until approximately 1920, the entire operations of Dun & Bradstreet, including the collection of past due accounts were handled locally through a single office and thus the collection business was carried on in Brimingham. In approximately 1920, the Mercantile Collection Division was created, but had no office in Birmingham. This division operated from Nashville and all Dun & Bradstreet collection business in Alabama was handled through the Nashville office until the early 1950's. In 1952, consideration was given to opening a Mercantile Collection Division office in Birmingham and at that time a conference was held with the Alabama State Department of Revenue on the subject of procuring appropriate licenses and an opinion on Dun & Bradstreet's collection practices. At that time, after reviewing the forms and procedures of Dun & Bradstreet, the Legal Division of the State Department of Revenue rendered its opinion that Dun & Bradstreet could lawfully operate in Alabama and specifically that its collection activities would not constitute the practice of law. The procedures outlined to and considered by the State Department of Revenue, although in general terms, were identical to the activities now sought to be enjoined. Thereafter, in reliance on this opinion, the Commercial Collection Division commenced operations in Birmingham and from that date to the present has served all but twelve counties in Alabama, and also twelve counties in Mississippi.

The Commercial Collection Division of Dun & Bradstreet collects accounts exclusively between manufacturers and wholesalers and their customers rather than accounts between retailers and their customers. The average commercial collection serviced by Dun & Bradstreet is approximately $250. Many of Dun & Bradstreet's commercial collection competitors operate from without the State of Alabama, i. e., they attempt to collect debts from Alabama debtors without maintaining an office in the State of Alabama, as does Dun & Bradstreet.

Prior to utilizing the collection services of Dun & Bradstreet, a creditor must execute a contract with Dun & Bradstreet. The contract provides that

the creditor ("Claimant") pay to Dun & Bradstreet an annual service charge of $49 per year, for which annual charge Claimant has the right to utilize the services of Dun & Bradstreet's Commercial Collection Division and receive the benefit of one collection letter which, if efficacious in collecting the account within ten days, carries no collection charge.

The collection business of Dun & Bradstreet is conducted and controlled by internal procedures and standard forms devised and prepared by Dun & Bradstreet. The procedures of Dun & Bradstreet are generally as follows: Claimant forwards a past-due account to Dun & Bradstreet on a form furnished to Claimant. Upon receipt of this form, Dun & Bradstreet writes the first collection letter, which, as explained above, if efficacious within ten days, results in no charge. Thereafter, a second series of various demand letters is sent depending upon the response or non-response of the debtor. This second series of letters is referred to in the contract and the remittance advice as "Supplementary Service." Upon the failure of collection attempts through correspondence, the account is transferred to the "Personal Collection Service", which consists of one or more telephone calls to the debtor. If the account is not amicably collected during any one of these collection attempts, the account is either returned to the Claimant for Claimant's disposition without charge for services performed, is forwarded to a lawyer of Claimant's choice without charge for services performed, or is forwarded, on behalf of the Claimant and pursuant to his request, to a lawyer of Dun & Bradstreet's choice. If the account is thus forwarded by Dun & Bradstreet, it is then put in the category of "Forwarding Service".

Generally, and in fact in approximately 95% of the cases, the Claimant elects to have Dun & Bradstreet select an attorney, because most claimants are not familiar with lawyers in distant cities who will and can expertly handle collec-

tions and ordinarily do not have access to law lists of collection lawyers. Upon such selection, the account is forwarded to a lawyer with a form letter. The accounts are forwarded to lawyers for collection upon Commercial Law League rates unless the attorney advises, or Dun & Bradstreet has knowledge, that such rates are not acceptable in a particular area. If these rates are not acceptable, Dun & Bradstreet advises the Claimant that the rate is different from Commercial Law League rates, and requests advice.

After the first free letter, Dun & Bradstreet charges a commission on all collections on a sliding scale as evidenced by the contract. If Dun & Bradstreet does not collect the account, it charges a lesser charge on a sliding scale for its forwarding service for clerical work in connection with the account, such charge, however, being completely independent of the fees and charges of the lawyer.

The salient features of Dun & Bradstreet's collection process which the Court considers to be of importance are as follows:

At no time during the collection process does Dun & Bradstreet threaten the debtor with legal proceedings for the collection of such accounts. Such is prohibited by Dun & Bradstreet in its internal procedures. The last demand letter sent to debtors and the strongest in language states that unless payment is received by a certain time ". . . we will have no alternative but to . . . refer this account to an attorney." The Court does not construe this letter as containing a threat of legal proceedings. This Court knows and the evidence supports the conclusion that many collections are effected by lawyers without the necessity of filing suit. A demand letter or letters from the attorney on many occasions will suffice.

Nor does Dun & Bradstreet make any decision that suit is warranted or justified. Rather, Dun & Bradstreet, pursuant to directions from the Claimant, forwards accounts to Claimant's attor-

ney on the sole determination that its efforts by correspondence and telephoning have been non-availing and the account cannot be collected amicably by Dun & Bradstreet. The decision of whether suit is warranted or justified is always and exclusively that of the lawyer. Thus the Court finds that Dun & Bradstreet in its collection practice does not threaten the debtor with legal proceedings.

Dun & Bradstreet never compromises an account which is questioned by the debtor. Should, during the collection process, a debtor object to payment of the account, Dun & Bradstreet automatically refers the matter to the Claimant for further instructions. In such cases, Dun & Bradstreet gives no advice to the debtor or to the Claimant and is given no discretion by the Claimant as to the settlement of such an account. Dun & Bradstreet's only function on an account which is questioned is to convey both to the debtor and to the Claimant each other's communications and any offers in compromise. If any legal question is presented, the account is immediately forwarded to a lawyer chosen by Claimant or by Dun & Bradstreet if the Claimant so indicates. The Court finds that this method of operation does not involve the settlement, adjustment or compromise of a defaulted, controverted or disputed account.

If the agreement between the Claimant and the debtor provides for costs of collection including attorneys' fees (such as is contained in many standard notes), Dun & Bradstreet never collects any attorneys' fees or costs of collection from the debtor. If the account is forwarded to an attorney and the attorney collects attorneys' fees or costs of collection, the charges of Dun & Bradstreet are wholly unaffected and always relate only to the principal sum of the debt and not any fees from the debtor for costs or charges, including attorneys' fees.

When the Claimant does not designate an attorney, Dun & Bradstreet uses various methods for determining to whom the account will be forwarded. In larg-

er towns, it generally uses several lawyers who, through experience, Dun & Bradstreet has determined are willing and capable of handling collections. For example, in 1971, accounts were forwarded to three legal firms in Birmingham. These accounts are forwarded at random to these lawyers on the basis of the volume of accounts that Dun & Bradstreet feels that can be handled by that particular lawyer in a proper manner. Outside of large towns, Dun & Bradstreet relies on published law lists of lawyers who are interested in handling collections. This Court well knows, and the evidence establishes, that there are many lawyers who have no interest in handling collections.

All of the evidence establishes that the lawyers chosen by Dun & Bradstreet never act as lawyers for Dun & Bradstreet, but rather act solely as Claimants' attorneys. It is further clear from the evidence that Dun & Bradstreet retains no control over such lawyers. Though correspondence may be channelled through Dun & Bradstreet, such correspondence relates basically to status reports. Further, where correspondence between the lawyer and the Claimant is transmitted through Dun & Bradstreet, it makes no recommendations, has no authority to direct or advise the lawyer to accept or reject any compromise, to authorize the incurrence of any expense or to grant any extensions of time. The role which Dun & Bradstreet plays as an intermediary in correspondence is solely for the convenience of the Claimant, who in most cases does not have a collection department to monitor the collection of debts, and in no respect affects or influences any decision or activity of the lawyer relating to legal questions or procedures in the collection of debts. The Court therefore finds that lawyers to whom Dun & Bradstreet forwards accounts for collection are lawyers of the Claimants, and do not in anywise represent Dun & Bradstreet.

In its transmittal letter to lawyers, Dun & Bradstreet asserts that it has subscribed to the Fair Practices of

Collection Agencies which was approved by the National Conference of Lawyers and Collection Agencies on February 18, 1968, and also the Statement of Principles issued by the American Bar Association under date of May 4, 1937 (which was superseded by the Fair Practices Statement adopted on February 18, 1968). Further, the testimony shows that Dun & Bradstreet's collection practice is conducted in accordance with such Fair Practices, and the Court finds that Dun & Bradstreet conducted its business in accordance with the Fair Practices of Collection Agencies since its adoption.

Accounts are never assigned to Dun & Bradstreet by the Claimants, but rather, Dun & Bradstreet always acts as the agent for the Claimant in attempting to secure collection. Further, the evidence is clear that Dun & Bradstreet never gives legal advice or prepares or files legal papers.

## CONCLUSIONS OF LAW

Title 46, § 42 of the Code of Alabama (1940) provides in relevant part:

§ 42. *Who may practice as attorneys.*—Only such persons as are regularly licensed have authority to practice law. For the purposes of this article, the practice of law is defined as follows: Whoever, . . . (d) as a vocation, enforces, secures, settles, adjusts or compromises defaulted, controverted or disputed accounts, claims or demands between persons with neither of whom he is in privity or in the relation of employer and employee in the ordinary sense; is practicing law. . . .

Plaintiff makes two basic arguments: first, he argues that § 42 outlaws all collection agencies. Second, he argues that certain practices of Dun & Bradstreet violate § 42. The Court, after careful consideration of the evidence, § 42, and the decisions of the Alabama Supreme Court interpreting § 42, is firm in its conclusion both that § 42 does not per se prohibit collection agencies and

that none of Dun & Bradstreet's collection practices constitutes the practice of law as defined in § 42.

■ The decisions of the Supreme Court of Alabama, which this Court must follow in this diversity case, show clearly that the Supreme Court has not taken a doctrinaire, *per se* approach to § 42, but rather has on a case-by-case basis sought to determine what specific practices are properly reserved for lawyers in light of their special expertise and the public interest. This pragmatic course is in line with the weight of authority nationwide. As is stated in the recent annotation, Operations of Collection Agency as Unauthorized Practice of Law:

It appears to be well settled that a collection agency in making a peaceful collection of a claim or in making a friendly adjustment of a bill without resort to a court of law does not engage in the unauthorized practice of law. In other words, the operation of a collection agency by and in itself does not constitute the practice of law. . . . Annot., 27 A.L.R.3d at 1156.

The point of beginning in understanding the meaning and reach of § 42 is Kendrick v. State, 218 Ala. 277, 120 So. 142 (1929), which involved the predecessor to § 42, § 6248 of the 1923 Alabama Code. In *Kendrick,* the Alabama Supreme Court held that the business of collecting defaulted or disputed claims out of court was an altogether separate subject from that of practicing law, and that the predecessor to § 42 was unconstitutional under Section 45 of the Alabama Constitution prescribing that "each law shall contain but one subject, which shall be clearly expressed in its title."

In reaching its conclusion in *Kendrick,* the Supreme Court stated:

This fact and the peculiarity of the statute will the more clearly appear if, varying the form of statement, but adhering strictly to the logical effect of the statute, it be stated thus: No man may follow the business of col-

lecting out of court claims disputed or in default, for others by whom he may be employed for the purpose, unless first he has procured a license to practice law . . . . Stated with a closer view to the purposed effect of the act, it means that no one but a licensed attorney shall undertake by demand or negotiation out of court the business of collecting for another any claim in default or in dispute. 218 Ala. at 278, 120 So. at 143.

This statement is the foundation of plaintiff's per se argument.

This argument must be rejected, however, in light of subsequent decisions of the Alabama Supreme Court which show that that Court has rejected a per se approach to § 42, and rather has taken a pragmatic approach, considering various practices attacked under the statute on a case-by-case, practice-by-practice basis.

Following *Kendrick*, the Alabama legislature reenacted § 6248 under a broader title. Thereafter, the Alabama Supreme Court decided Berk v. State, 225 Ala. 324, 142 So. 832 (1932), the leading Alabama case on the application of § 42 to collection agencies.

*Berk* was a *quo warranto* proceeding filed by the president of the Birmingham Bar Association against a commercial collection agency. The complaint tracked the language of § 42(d). It also alleged (1) that the defendant turned collection matters over to "his" attorney "when in his judgment it was necessary;" (2) that in the course of collection, the defendant made specific threats to institute suit and garnishment proceedings by a notice headed "Final notice before garnishment;" and (3) that the defendant for its compensation collected a fee directly from the debtor over and above the principal amount of the debt when the instrument creating the debt authorized the collection of such a fee. The defendant's demurrer to the complaint was overruled and upon defendant's failure to plead further, the trial court, on the basis of the allegations of the complaint, adjudged that the defendant was engaged in the unauthorized practice of law and enjoined the defendant from further practicing law in Jefferson County.

The Supreme Court in *Berk*, after reciting these facts, framed a specific question before the Court for decision:

> *Under the facts alleged in the petition relative to the alleged business of defendant-appellant*, was he, had he been, and did he propose "to practice law" unlawfully without having the required license to engage in such practice? Otherwise stated, the first question for decision is: Did the *averred acts* constitute "the practicing of law" per se? 142 So. at 834 [Emphasis supplied.]

After so stating the limited question for decision, there ensued a lengthy discussion establishing the well known fact, acknowledged in *Kendrick*, that lawyers collect debts. Upon completion of this discussion, the Alabama Supreme Court answered the narrow question it posed for decision in terms equally as circumscribed:

> The *acts recited in the petition* constituted the practicing of law as defined by the statutes relating to and defined in General Acts of 1931, p. 606. Such was the legislative intent, and is the construction placed by this court on the several statutes and the common law relating to and regulating the practice of law and the duty of an attorney to his client. 142 So. at 837 [Emphasis supplied.]

Thus, the specific issue presented for decision in *Berk* as framed and resolved by the Alabama Supreme Court, was carefully limited to the specific acts averred in the complaint in that case.

The restrained approach of the Court to § 42 in *Berk* is further apparent from the Court's discussion of *Kendrick*. The Court, by reference to language in *Kendrick* quoted above, could have affirmed the trial court without regard to specific practices by stating that any collection activity per se violated § 42 and distinguished *Kendrick* on the simple ground

that subsequent to *Kendrick,* § 42 had been reenacted under a broader title. The Court in *Berk* did use this ground to distinguish *Kendrick,* but it was the fifth of five grounds of distinction asserted by the Court. The first three related to the specific collection methods enumerated above which were not a part of the record in *Kendrick* and which were specifically condemned in *Berk.* The Court said:

> There are distinguishable features between the case at bar and the Kendrick Case which render that case inapt as an authority against the judgment of ouster rendered against defendant: (1) There is no expression in the Kendrick Case of the court's consideration and decision dealing with any conduct of the defendant in and about his collection business in contracting with his patrons to *turn over to his lawyer for legal proceeding* or purposes, or any legal claims being handled by him, *when in his judgment it was necessary that legal proceedings be had for the collection of them*; (2) nor anything as to any custom of his in said business in exacting from the debtor fees in the collection of notes under the usual provisions contained in notes for the collection of costs, including a reasonable attorney's fee incident to making the collection; (3) nor was there any question concerning the defendant adopting in his course of that business methods of threatening the debtor with legal proceedings for the collection of the claims as a means of forcing collection; . . . . 142 So. at 837 (Emphasis in text.)

■ The Court concludes, therefore, that *Berk* simply cannot be read as outlawing collection agencies per se. In framing the issue for decision in *Berk* in resolving it, and in distinguishing *Kendrick,* the Alabama Supreme Court made clear that its holding in *Berk* was no broader than an adjudication that specific acts engaged in by the defendant constituted the unauthorized practice of law under the statute. There is simply no way to fairly conclude that its holding is any broader.

Plaintiff also argues that the reenactment of § 6248 in § 42 without material change after it was discussed in *Kendrick* meant that the legislature adopted the judicial interpretation of *Kendrick.* Even assuming that the Court in *Kendrick* interpreted § 42 as outlawing collection agencies per se (and this Court does not read *Kendrick* so broadly), the Court in *Berk* certainly did not so interpret *Kendrick* or § 42, and it is not the province of this Court in this diversity case to base its decision on an interpretation of § 42 which the Alabama Supreme Court could or might have made.

Plaintiff's position that § 42 abolished collection agencies per se in Alabama is further refuted by the action taken by the Supreme Court in 1940 pursuant to Title 46, § 34, eight years after its decision in *Berk,* in approving the Amended Rules Governing the Conduct of Attorneys in Alabama and thus readopting Rule 23 which was originally adopted in 1924. 239 Ala. XXIII, XXX. Rule 23 expressly allows "the division of fees with a forwarder of business whether such fowarder be an attorney or *reputable collection agency.*" *Id.,* p. XXIV (emphasis added). If *Berk* had outlawed all collection agencies per se there would have been no need for the Supreme Court to approve a rule allowing an attorney to divide fees with a "reputable collection agency."

Birmingham Bar Association v. Phillips and Marsh, 239 Ala. 650, 196 So. 725 (1940), further convinces this Court that the Alabama Supreme Court has not taken an inflexible, *per se* approach to § 42, but rather has sought to determine which specific acts wrongfully intrude into that area of practice which should be reserved exclusively for lawyers. *Phillips and Marsh* involved the Bar's attack on insurance adjusters. In it, the Birmingham Bar Association filed a declaratory judgment action against virtually everyone in Jefferson County in the adjustment business.

The trial court sustained the defendants' demurrers to the complaint on the ground of misjoinder and the Supreme Court affirmed on this ground. But in the process of affirming, the unanimous Supreme Court raised a number of questions about the scope and breadth of § 42. Specifically, the Court asked:

One of the major functions of the lawyer is the giving of legal advice to the layman that he may conduct his business according to law. Wise men generally look to him to draft their difficult legal documents, or give needed advice as to their form and contents.

But, is this service only required when sought? Has the citizen the right to make his own lawful contracts, to put them in form, and employ such agents as he may choose with power to act as alter ego in connection with the employer's business committed to him?

\* \* \* \* \* \*

Is there a field for the independent adjuster? If so, when does he enter the field of the legal profession? Admittedly he may not engage in the business of giving advice to his employer, nor pose as attorney at law in dealing with the insured or beneficiary of the insurance. Is he engaged in the practice of law if he does more than investigate and report the facts, or may he be empowered to do what his employer may do—adjust, settle and take releases?

\* \* \* \* \* \*

Is defining the practice of law a judicial function or a legislative function or both? Is our statute, supra, defining the practice of law to be taken literally, or to be construed in some of its terms in a limited way in keeping with prior announcements on the subject? . . . 196 So. at 731.

From these questions it is obvious that the Supreme Court did not approach § 42 with a view to eliminating entire businesses with broad strokes, as plaintiff would have this Court do. Rather, in *Phillips and Marsh*, the Court, in discussing § 42, asked what is the legitimate "field for the independent adjuster" (or the collection agency) and when does the adjuster (or the collection agency) "enter [into] the field of the legal profession."

Though these questions were not answered in *Phillips and Marsh*, they were in large part answered in Wilkey v. State, 244 Ala. 568, 14 So.2d 536 (1943).

*Wilkey* was a *quo warranto* proceeding filed by the president of the Birmingham Bar Association against a defendant engaged in the insurance adjustment business. According to the Alabama Supreme Court, that case, much like this one, had as its

. . . primary purpose . . . to have this court determine whether or not there is a field of operation under the laws of this state for the independent insurance adjuster and, if so, draw a line of demarcation between those acts which constitute the practice of law and those acts connected with the usual course of conduct of such a business which do not amount to the practice of law. 14 So.2d at 540.

After a lengthy recitation of the facts, the Supreme Court set about its task of drawing this "line of demarcation" between the practice of law and other conduct which could be legitimately performed by the insurance adjuster. The line was drawn with statutory words, but in substance was a pragmatic line to preserve to the lawyer his legitimate practice in light of his unique skills and to the insurance industry an efficient, economic method of settling claims. Specifically, the Supreme Court held that the insurance adjuster was not practicing law in adjusting claims and negotiating settlements short of a statutory "controversy," "dispute" or "default." The Supreme Court held that when efforts to settle a claim through negotiation and adjustment failed, a statutory dispute, controversy or default arose and at this point drew the "line of demarcation" and stated that further

proceedings on the claim had to be conducted by a lawyer.

Specifically, the Supreme Court found that an insurance adjuster without intruding into the practice of law could (1) investigate a claim factually, (2) adjust collision losses where liability is not controverted, even where application of a deductible provision in the policy is required, (3) adjust and settle small claims, even without specific approval of the insurance company's counsel "if an insurance company, in the interest of *economical management* deems it wise to inaugurate and maintain such a policy relative to small claims . . .," (4) adjust and settle larger claims after initial authority is given by the insurance company at a negotiated amount less than the initial authority without further contact with the insurance company; and (5) secure execution of releases by the claimant if the release was prepared by the insurance company rather than the adjuster.

Thus, as in *Berk* and *Phillips and Marsh,* the Supreme Court in *Wilkey* pursued a pragmatic rather than an inflexible course through § 42. The substance of the "line of demarcation" which the Supreme Court drew was that up to the point where "negotiations are no longer possible" the insurance adjuster may lawfully operate. Beyond that point where legal proceedings are necessary to settle the claim, the domain of the attorney begins. The evidence shows convincingly that Dun & Bradstreet, as the insurance adjuster, pursues the collection of accounts only to that point where settlement of a claim can no longer be pursued "amicably." At this point the matter is turned over to an attorney. As such, its collection activity is within the "line of demarcation" to be drawn under § 42 between the practice of law and the lay collection of debts.

■ The Court now turns to several specific practices of Dun & Bradstreet attacked by the plaintiff. First, plaintiff urges that Dun & Bradstreet practices law because it "threatens" the debtor with court action. The Alabama Supreme Court in *Berk* condemned the practice presented in that case of mailing to the debtor a "threat . . . to institute suit, and in aid thereof a garnishment forthwith against the maker of the note in the municipal court of Birmingham, wherein the employer of the maker of said note was to be made garnishee for the collection of said note by judicial proceedings . . . ." The practices of Dun & Bradstreet evidenced in this case are far removed from those prescribed in Berk. Dun & Bradstreet never refers to any legal proceeding in any contact with the debtor; it does not threaten any suit and it does not threaten any garnishment. Dun & Bradstreet's notices go only to the point of stating that the Claimant will take "steps to enforce collection" or that Dun & Bradstreet will "forward this account to an attorney" if the debt is not paid. Plaintiff suggests no reason why such communications should be made only by lawyers, and this Court finds nothing in either § 42 or the decisions interpreting it which would preclude a collection agency's making them. Certainly no legal reasoning is required to make them. This Court, therefore, concludes that such communications fall outside the sphere of activity which § 42 preserves for lawyers.

■ Much stress is made by attorneys for plaintiffs that Dun & Bradstreet, through direct advertising and personal solicitation and other sales efforts, solicits collection business from claimants, and further takes the position that such gives Dun & Bradstreet an unfair advantage over lawyers who are forbidden to solicit business. There is, of course, no way to determine how many accounts would eventually be turned over to lawyers if lay collection agencies were not used, *i.e.,* whether the creditor himself would make more aggressive attempts at collection or if the dollar amount were small, write the matter off as a bad debt rather than seek to have it collected. There is testimony

that more than 50% of the claims turned over to the Birmingham office by claimants eventually are forwarded to lawyers. Nonetheless, nothing in § 42 or any other Alabama law or decision prohibits this activity.

■ Further, complaint is made that in view of the fact Dun & Bradstreet also operates a Reporting Service which not only rates businesses as to credit responsibilities, but also furnishes credit reports, that the debtor's fear of his credit rating being impaired gives Dun & Bradstreet an unfair advantage over lawyers. Whether a demand for payment by Dun & Bradstreet or the threat of judicial proceedings by a practicing lawyer is more efficacious to collect a debt amicably is unknown by this Court. In any event, at no time is the debtor advised that his credit rating will in any way be affected by any failure to pay any claims turned over to the Commercial Collection Division of Dun & Bradstreet. Further, the evidence discloses that the collection and reporting aspects of Dun & Bradstreet's business are entirely separate and distinct in operation. Whether or not the Reporting Services makes Dun & Bradstreet's collection service more effective does not touch upon the question of whether or not Dun & Bradstreet is practicing law.

Applying the law of Alabama, it is clear that the activities of Dun & Bradstreet do not violate § 42 of Title 46, Code of Alabama (1940) either in letter or in spirit. It engages in none of the activities condemned by the Court in *Berk*. Nor does it engage in any activity condemned in the Statement of Principles formualted by representatives of the American Bar Association and representatives of the collection agencies.[1]

The Court therefore concludes that judgment is due to be entered for defendant.

Dun & Bradstreet has also raised as defenses that if § 42 is construed to pro-

hibit its collection practices, that § 42 violates various sections of the Alabama and United States Constitutions and contravenes the Anti-trust Laws of the United States. In view of the Court's holding that Dun & Bradstreet does not violate § 42, the Court pretermits consideration of these issues.

---

1. Notwithstanding this Statement of Principles cannot govern the interpretation of § 42, it is relevant in determining where the "line of demarcation" between the practice of law and the business of collection agencies should be drawn.